# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-15-00783-CV

**Wallace L. Hall, Jr., in his Official Capacity as a Regent for the
University of Texas System, Appellant**

**v.**

**William H. McRaven, in his Official Capacity as Chancellor of the
University of Texas System, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
NO. D-1-GN-15-002473, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

Wallace Hall, in his official capacity as a Regent for the University of Texas System, appeals the trial court's order granting the plea to the jurisdiction of William McRaven, in his official capacity as Chancellor for the University of Texas System. This interlocutory appeal is the culmination of a dispute concerning Hall's asserted right, as a Regent for the UT System, to review certain records containing confidential student information. A majority of the Board of Regents voted to provide the records to Hall but with redactions to keep personally identifiable student information confidential. Hall seeks the records in unredacted form and asserts that McRaven, as Chancellor, is committing an ultra vires act by not providing the records to him. Because we conclude that Hall has not established that the ultra vires exception to sovereign immunity applies in this case, we will affirm the trial court's order.

**BACKGROUND**

**Statutory overview**

We begin by providing an overview of the organization of the UT System and the powers and authorities of the various parties involved because the scope of McRaven's authority is a pivotal issue in this case. The Texas Constitution gives the Texas Legislature the duty and authority to provide for the maintenance, support, and direction of The University of Texas. *See* Tex. Const. art. VII, § 10. The Legislature in turn created the UT System, a governmental entity composed of a number of higher-education institutions in the State of Texas. *See generally* Tex. Educ. Code §§ 65.01-79.10. The Legislature has delegated the power and authority to govern, operate, support, and maintain the UT System and the educational institutions within the UT System, including The University of Texas at Austin, to the Board of Regents, which is composed of nine members. *Id.* §§ 51.352, 65.11, 65.31, 67.02.

The Legislature has also given the Board of Regents the "authority to promulgate and enforce such other rules and regulations for the operation, control, and management of the university system . . . as the board may deem either necessary or desirable." *Id.* § 65.31(c). The Board of Regents' Rules and Regulations have the same force as statutes. *University of Houston v. Barth*, 403 S.W.3d 851, 855 (Tex. 2013); *see also* The University of Texas Sys., Rules & Regulations of the Bd. of Regents ("Regents' Rules"), Rule 10101: Bd. Authority & Duties, § 1 (Authority of the Bd.).[1] "The board by rule may delegate a power or duty of the board to a committee, officer, employee, or other agent of the board." Tex. Educ. Code § 65.31(g). One of the Board's powers and

---

[1] Unless otherwise noted, the Regents' Rules cited are the current version of the Rules.

2

duties established by the Education Code is the power and duty to "set campus admission standards consistent with the role and mission of the institution and considering the admission standards of similar institutions nationwide having a similar role and mission." *Id.* § 51.352(d)(4).

The duties and responsibilities of each individual Regent include being "knowledgeable in some detail regarding the operations, management, finances, and effectiveness of the academic, research, and public service programs of the U.T. System." Regents' Rules, Rule 10101: Bd. Authority & Duties, § 3 (Duties & Responsibilities of Each Regent), at 3.1. Each Regent has the right and authority to inform himself as to his duties, responsibilities, and obligations. *Id.* "Members of the Board of Regents are to be provided access to such information as will enable them to fulfill their duties and responsibilities as Regents of the U.T. System." *Id.* An individual Regent's request for information is to be processed in compliance with Regents' Rule 10801, which we will discuss in more detail later. *Id.* at 3.2. A Regent with concerns about operations, accountability, compliance, or the need for an investigation must bring those concerns to the Chancellor, the Chairman, the Board, or an appropriate Committee of the Board. *Id.* at 3.4.

As Chancellor, McRaven is the current chief executive officer of the UT System, and he is appointed by the Board of Regents. *See* Tex. Educ. Code §§ 51.352(d)(2), 65.16(b); *see also* Regents' Rules, Rule 20101: Chancellor, § 1 (Role). The Education Code provides that:

> Subject to the power and authority of the board, the chief executive officer is responsible for the general management of the university system within the policies of the board and for making recommendations to the board concerning the organization of the university system and the appointment of the chief administrative officer for each component institution within the system.

3

Tex. Educ. Code § 65.16(c). As McRaven summarized, his duties as CEO include providing "strategic guidance and oversight of the institutions within the University of Texas System." The Regents' Rules give him direct-line responsibility for all aspects of the UT System's operations. *See* Regents' Rules, Rule 20101: Chancellor, § 1 (Role). The Board governs the UT System, and McRaven reports to and is responsible to the Board. *See id.*

**Factual background**

The immediate backdrop of this dispute arose in connection with an investigation into admissions practices at The University of Texas at Austin that the prior Chancellor, Francisco Cigarroa, commissioned to be conducted for the UT System by Kroll Associates, Inc.[2] The purpose of the Kroll investigation, as described in the "Scope of Work" section of the agreement that the System executed with Kroll, was to "determine if U.T. Austin admissions decisions are made for any reason other than an applicant's individual merit as measured by academic achievement and officially established personal holistic attributes," and in particular, whether applicants gain an advantage by being recommended outside the prescribed admissions process by an influential individual "who adds no new substantive information about the applicant's personal merit." As explained in the Kroll Report, which was issued following the investigation, the investigation's focus "was to evaluate the conduct of UT-Austin, UT-System, and UT-System Board of Regents officials and employees in performing admissions services, not on any external recommenders."

---

[2] This summary of the background facts, which are materially undisputed, is taken from the evidence that the parties presented in support of or opposition to McRaven's plea to the jurisdiction and Hall's summary-judgment motion.

4

For purposes of the investigation and compliance with the Family Educational Records Privacy Act ("FERPA"), a federal law that protects the privacy of student education records, the UT System designated Kroll as its "Authorized Representative" to conduct this evaluation of the educational program. *See* 20 U.S.C.A. § 1232g(b)(3), (5) (West 2010) (allowing access to student records necessary to evaluation or audit of any federal- or state-funded education program); *see also* 34 C.F.R. §§ 99.3 (defining "authorized representative"), 99.31(a)(3) (allowing disclosure of protected educational records without prior student or parent consent to authorized representative), 99.35 (allowing "State educational authority," such as UT System, to use protected educational records and to designate authorized representative in connection with audit or evaluation of any federal- or state-funded education programs that State educational authority operates). The agreement with Kroll specified in the "Scope of Work" section that the Kroll investigators "may have access to and/or use Education Records and/or 'Personally Identifiable Information' about students derived from Education Records (collectively 'FERPA Records' as permitted by and consistent with the Family Education Rights and Privacy Act ('FERPA,' 20 USC Sec. 1232g, 34 CFR Part 99))." The agreement further specified that the final report prepared by Kroll was to contain no personally identifiable student information "derived from FERPA Records" that were accessed by Kroll. Kroll delivered its "Final Report to the Office of the Chancellor of the University of Texas System" on February 6, 2015 ("Kroll Report").

McRaven, who began serving as Chancellor in January 2015, reviewed the findings in the Kroll Report and, among other actions, informed the Board that he was convening a committee to review Kroll's recommendations for improving the admissions process. McRaven subsequently

5

asked a panel of former chancellors and university presidents to review the admissions process and make recommendations. The panel issued a report on April 13, 2015, with recommendations to change the admissions process. The Board considered and adopted a new admissions policy for all UT System academic institutions on August 20, 2015.

In the meantime, in early March 2015, Hall requested that he be allowed to review all information, "confidential and otherwise," related to the Kroll investigation. As we will address in more detail below, the Board considered his request and McRaven's recommendation for handling that request and then ultimately approved a two-step process for Hall's review of the documents. Under the Board-approved two-step process, Hall would (1) review all confidential and nonpublic documents gathered by Kroll with information deemed to be protected by FERPA and other privacy laws redacted and (2) identify and discuss further with the Chairman of the Board, Paul Foster, and the Chancellor any specific redacted private information that he believes "necessary for him to review in order to satisfy an articulated, specific need related to his official responsibilities and duties as a Regent." The Board also voted to delegate to Chairman Foster, in consultation with the Board's Vice Chairmen and its General Counsel, the authority to determine whether a specific need for information is related to the official responsibilities and duties of a Regent.

Hall did not agree to the two-step process first offered to him through discussions with McRaven and the System's Office of General Counsel and ultimately approved by the Board. On June 22, 2015, he filed the underlying lawsuit seeking declaratory, mandamus, and injunctive relief and contending that McRaven is acting ultra vires by refusing to provide all of the Kroll records in unredacted form for Hall's review. In response, McRaven challenged subject-matter

6

jurisdiction on the grounds of sovereign immunity, mootness, standing, and (as it relates to jurisdiction) capacity. Hall filed a summary-judgment motion and response to the plea to the jurisdiction, advancing his assertions that he has a right to receive the unredacted student records as a matter of law because privacy laws do not prohibit Regents from reviewing confidential admissions information, and therefore, that McRaven is acting ultra vires in withholding the Kroll information. Following a hearing on McRaven's plea to the jurisdiction and Hall's summary-judgment motion, the trial court granted McRaven's plea to the jurisdiction and dismissed the case without specifying the grounds on which it relied. The order did not refer to or purport to rule on Hall's summary-judgment motion. This appeal followed.

## DISCUSSION

Hall asserts three issues on appeal challenging the trial court's order granting McRaven's plea to the jurisdiction. Hall argues that (1) he properly invoked jurisdiction through the ultra vires exception to sovereign immunity, (2) the case is not moot, and (3) he has standing and capacity to vindicate his responsibilities as a Regent. The parties agree that the evidence material to these issues is undisputed.

### Standard of review

Subject-matter jurisdiction is a question of law; therefore, we review a trial court's ruling on a plea to the jurisdiction de novo. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The initial burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction. *Id.* When analyzing a plea to the jurisdiction, we begin with the live

7

pleadings. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012). We construe the plaintiff's pleadings liberally, taking all factual assertions as true, and look to his intent. *Id.* "Mere unsupported legal conclusions do not suffice." *Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 170 (Tex. App.—Austin 2013, no pet.). "We may also consider evidence submitted to negate the existence of jurisdiction—and we must consider such evidence when necessary to resolve the jurisdictional issue." *Heckman*, 369 S.W.3d at 150.

In this case, McRaven presented evidence in his plea to the jurisdiction to negate the existence of jurisdictional facts alleged in Hall's pleadings, which we would otherwise presume to be true. *See Miranda*, 133 S.W.3d at 227. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228. Because the parties agree in this case that the relevant evidence is undisputed, our ultimate inquiry is whether the trial court correctly determined that it lacked subject-matter jurisdiction as a matter of law. *See id.*

**Sovereign immunity**

Sovereign or governmental immunity deprives Texas courts of subject-matter jurisdiction over any suit against the State, its agencies or agents, and in some instances, governmental subdivisions, absent the State's consent. *See id.* at 224; *see also Texas Nat. Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 853-54 (Tex. 2002) (stating that only Legislature may waive or abrogate sovereign immunity either by statute or by resolution); *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004) (explaining that governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State). The modern justifications

8

for the doctrine are protecting the public treasury from the costs of litigation and preserving separation-of-powers principles because the doctrine prevents the judiciary from interfering with the legislative prerogative to allocate tax dollars. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015). "[S]overeign immunity generally shields our state government's 'improvident acts' . . . against the litigation and judicial remedies that would be available if the same acts were committed by private persons." *Bacon*, 411 S.W.3d at 172. This same immunity generally extends to a state official who is sued in his official capacity, as is the case here with McRaven. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (noting that suit against state official is merely another way to plead suit against entity for which official is agent). Hall recognizes that his claims would potentially implicate this immunity but relies on the ultra vires exception to invoke the trial court's jurisdiction.

Under the ultra vires exception, sovereign immunity does not bar suit against a state official acting in his official capacity when that suit seeks prospective injunctive or declaratory relief to compel the state official's compliance with statutory or constitutional provisions. *Id.* at 372-75. Sovereign immunity does not bar such claims because "extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended." *Id.* at 372. To fall within the exception, the suit "must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* Ministerial acts leave nothing to the exercise of discretion or judgment by the governmental officer. *Southwestern Bell Tel. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015). But immunity "does not protect *every* act by a government officer that requires some exercise of judgment—a government

9

officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016).

Accordingly, to determine whether Hall has asserted a valid ultra vires claim that invokes the trial court's subject-matter jurisdiction, we must construe the provisions of the Education Code and the Regents' Rules that define the scope of McRaven's delegated authority as Chancellor, compare these parameters to the facts alleged by Hall and the evidence material to McRaven's actions, and analyze whether any pleaded and unnegated facts demonstrate that McRaven took action outside of his legal authority or establish his failure to perform a purely ministerial act. *See Houston Belt*, 487 S.W.3d at 164-68 (determining whether plaintiffs alleged viable ultra vires claims by examining language of relevant ordinance that granted city official authority and some discretion to act); *see also Southwest Pharmacy Sols., Inc. v. Texas Health & Human Servs. Comm'n*, 408 S.W.3d 549, 557 (Tex. App.—Austin 2013, pet. denied). "Although only exercises of absolute discretion are absolutely protected, whether a suit attacking an exercise of limited discretion will be barred is dependent upon the grant of authority at issue in any particular case." *Houston Belt*, 487 S.W.3d at 164.

**Statutory construction**

In this case, although neither party challenges the meaning of the statutes or Rules, we must analyze them to determine whether McRaven took action outside of his legal authority or failed to perform a purely ministerial act. We review issues of statutory construction de novo.

*Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). As noted earlier, the Regents' Rules have the same force as statutes. *Barth*, 403 S.W.3d at 855; *cf. TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) (noting that courts "interpret administrative rules, like statutes, under traditional principles of statutory construction"). The Board's official interpretation placed upon a Rule "becomes a part of the rule." *Foley v. Benedict*, 55 S.W.2d 805, 808 (Tex. 1932). Our primary objective when construing statutes or rules is to give effect to the enacting body's intent, which we seek first and foremost in the text of the statute or rule. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631-32 (Tex. 2008). The plain meaning of the text is the best expression of intent, unless a different meaning is apparent from the context or application of the plain language would lead to absurd results. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). "[W]e 'read the statute as a whole and interpret it to give effect to every part.'" *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002) (quoting *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998)). Consequently, when interpreting provisions of the Education Code and the Regents' Rules, we must consider their role in the broader statutory scheme. *See 20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008). With these principles in mind, we turn to consideration of the scope of McRaven's legal authority.

**McRaven's legal authority**

Hall asserts that he has proven as a matter of law that McRaven is acting ultra vires by refusing to provide the entire Kroll file in unredacted form to Hall. Hall contends that he has, as a Regent, an absolute right to review any information that he requests unless review of that information is prohibited by law, and accordingly, that the question of law for this Court to decide

11

is whether his review of the requested information is prohibited by law. He contends that FERPA and other privacy laws do not prohibit his review and that the Board's lack of approval for an independent investigation by Hall is irrelevant.

The question of law for this Court to decide, as framed by the proceedings below, is not whether Hall's request for unredacted personally identifiable student information is prohibited by privacy laws such as FERPA. The question of law for this Court to decide is whether McRaven's refusal to provide Hall with the unredacted documents exceeds the scope of his legal authority or is a failure to perform a purely ministerial act. We turn first to the question of whether McRaven's refusal to provide Hall with the unredacted documents is action outside of his legal authority.

We addressed earlier in this opinion the broad parameters of the authority of the Board, the individual Regents, and the Chancellor, as established by statute and the Regents' Rules. We now turn to the specifics of Regents' Rule 10801, which addresses the process for handling an individual Regent's request for UT System information.[3] *See* Regents' Rules, Rule 10801: Policy on Transparency, Accountability, & Access to Information, § 5.4 (Requests by Members of the Bd. of Regents & Chancellor). Section 5.4 of the Rule establishes the responsibilities of the Chairman of the Board and the Chancellor when an individual Regent requests "significant quantities" of information from the UT System. *Id.* at 5.4.3. Section 5.4.2 of the Rule states:

> Except for a request processed under Subsection 5.4.4 [covering smaller requests], requests by an individual Regent for information shall be submitted to the Chancellor in writing by the requesting Regent, with a copy to the Board Chairman and General

---

[3] The parties do not dispute that on May 14, 2015, the Board amended Rules 10801 and 10101.

12

Counsel to the Board. An individual Regent's written request for information shall identify, with specificity, the need for the information requested and shall provide a requested deadline for response if the request is time-sensitive.

Hall initially requested all information "confidential and otherwise" related to the Kroll investigation from the Board's General Counsel. According to McRaven's brief, Hall's request encompasses hundreds of thousands of pages. The Kroll Report states that Kroll reviewed approximately 9500 internal emails, as well as data from the UT-Austin mainframe and over 100 specific student application files. Hall's initial request did not identify the need for the information requested.

Section 5.4.3 of Rule 10801 requires the Chairman of the Board and the Chancellor to review information requests seeking the compilation of significant quantities of information or data, and if necessary, to discuss the request with the Regent to determine the appropriate scope of the request. Section 5.4.5 requires that "in the rare circumstance" when there are concerns about a Regent's request that are unresolved following discussion with the Regent, the matter must be presented to the Board for a vote. After Hall made his request, the Chairman of the Board, Paul Foster, called a special meeting of the Board on April 8, 2015 to present the request for a vote.

During the April Board meeting, Hall made a motion requesting to review all Kroll data, including "FERPA data," i.e., personally identifiable student information that would be subject to FERPA. Hall's motion passed with a minority vote, as permitted under the Rules in effect at that time. After the vote, Chairman Foster stated his understanding that "because the motion includes FERPA data, that nothing will happen immediately. Mr. Sharphorn [the UT System's Vice Chancellor and General Counsel] will review the request and the information and make a

13

determination as to whether or not it is legal to provide the information." After the April Board meeting, Hall corresponded with Sharphorn and the UT System's Systemwide Privacy Officer (who works in the General Counsel's office) to explain his asserted educational interest in the personally identifiable student information. Under FERPA, the institution determines whether "school officials" have "legitimate educational interests" in student education records containing personally identifiable student information. 20 U.S.C.A. § 1232g(b)(1)(A) (West 2010); 34 C.F.R. 99.31(a)(1)(i)(A). If the school official is determined to have a legitimate educational interest in the records, he or she can access those student education records without prior student or parent consent. 20 U.S.C.A. § 1232g(b)(1)(A) (West 2010); 34 C.F.R. 99.31(a)(1)(i)(A).

During the April Board meeting, several Regents expressed their concern from an internal-governance standpoint that the then-existing Rule allowed only two Regents to overrule the recommendation of the Chancellor and the Chairman. Subsequently, in May 2015, the Board voted to revise Rule 10801 to require a majority vote when a Regent's request for information was presented to the Board under Section 5.4.5. Section 5.4.5 as amended provides:

> Within 5 business days of the receipt of a Regent's information request, the Chancellor's Office will provide the requesting Regent with an estimated date for delivery or production. The Board requires all U.T. System Administration and U.T. System institutional employees to respond thoroughly and appropriately to requests for information from a member of the Board or the Chancellor, without undue delay. In the rare circumstance when the Chairman or the Chancellor has concerns about a Regent's request, the matter will be discussed with the Regent within 5 business days of receipt of the request. If concerns about a request for information or data are unresolved following discussion with the Regent, the matter will be presented to the Board as quickly as possible, but in no event later than the next regular Board meeting following the date of the receipt of the request. For the purpose of a Board vote on this issue, **the vote of a majority of the members of the Board in support of the request is sufficient to direct that the request will be filled without delay.**

14

(Emphasis added.) Hall does not challenge the Board's authority to amend the Regents' Rules by majority vote, and he has not asserted a claim seeking to invalidate Section 5.4.5 as amended.[4] *See* Regents' Rules, Rule 10100: Rule on Rules and Regulations, § 1 (establishing that Regents' Rules may be amended by majority of the Board). In his briefing, Hall further states that his "argument does not rely on the April 8 vote taken under the old rule."

Also in May, McRaven proposed to Hall the two-step process for reviewing the documents that was ultimately approved by the Board, and Hall continued to assert his claimed right to see the entirety of the documents in their unredacted form. In June, Hall filed the underlying suit. At the July Board meeting, "[i]n an effort to effect a clear and open statement of the position of the Board of Regents related to pending litigation concerning access to certain documents and records,"

---

[4] The Board also added Section 5.4.6 to Rule 10801 when it revised the Rule. Section 5.4.6 provides:

> After consultation with the Chairman of the Board, the Chancellor may adopt reasonable procedures with regard to the timing, copying, and process for review of records by a Regent, including prohibiting the copying of any confidential material. In addition, the Chancellor, in consultation with the U.T. System General Counsel, shall determine whether State or federal law restricts compliance with the request. Accordingly, the Chancellor, in consultation with the U.T. System General Counsel, shall determine whether a Regent may review information that is protected by the Family Educational Rights and Privacy Act (20 U.S.C. §1232g; 34 CFR Part 99), by constitutional privacy, or by other State or federal law.

The parties do not address Section 5.4.6 in their briefing. While this Section grants authority to the Chancellor, in consultation with the Chairman and the U.T. System General Counsel, to make privacy determinations when a Regent requests information, it does not limit the Board's ability to make its own determination in "the rare circumstance when the Chairman or the Chancellor has concerns about a Regent's request," and the request is presented to the Board for a majority vote. *See* Regents' Rules, Rule 10801: Policy on Transparency, Accountability, & Access to Information, § 5.4 (Requests by Members of the Bd. of Regents & Chancellor), at 5.4.5.

15

a majority of the Board voted in favor of providing Hall access to the Kroll documents subject to the two-step process, which, as it appears in the Board meeting minutes, would allow Hall:

- access to review all confidential and nonpublic documents gathered by Kroll, with redactions only for those documents and information protected by the Family Educational Rights and Privacy Act (FERPA), the Health Insurance Portability and Accountability Act (HIPAA), or other privacy laws, as determined applicable by the Vice Chancellor and General Counsel in consultation with the System Administration Privacy Officer and Systemwide Privacy Coordinator, and

- the opportunity for Regent Hall to identify and to discuss further, with the Chairman and the Chancellor, specific, redacted private information <u>protected by FERPA, HIPAA, or other privacy laws</u> in those documents which he believes are necessary to review in order to satisfy an articulated, specific need related to his official responsibilities and duties as a Regent.

(Emphasis in original.) In addition, the Board voted to "delegate to the Chairman in consultation with the Vice Chairmen and General Counsel to the Board, the authority to determine whether a specific need for information is related to the official responsibilities and duties of a Regent." Accordingly, upon Hall's identification of any specific, redacted private information that he believes necessary to review, Chairman Foster, in consultation with Vice Chairman Steven Hicks, Vice Chairman Jeffrey Hildebrand, and the Board's General Counsel Francie Frederick, would have the authority to decide whether Hall had demonstrated a specific need for information related to the official responsibilities and duties of a Regent.

In context, the parties' interactions in April, May, and June, culminating in the Board's July motion and vote, show that the Board rejected Hall's assertion that he had the "legitimate educational interest" required by FERPA or was otherwise authorized to see confidential

16

student records. Had the Board agreed with Hall that he was entitled to see all the documents in their unredacted form, there would not be a need for the two-step process. The second step of the process reinforces the Board's decision that Hall would not be given access to the Kroll documents in unredacted form, but this step gives him the opportunity to demonstrate a legitimate educational interest in particular documents or information. The Board decided that if, after reviewing the redacted file, Hall could identify specific redacted information that he wanted to see in unredacted form, he would have the opportunity to further discuss those documents that he believes are necessary to review in order to satisfy an articulated, specific need related to his official responsibilities and duties as a Regent. In this "rare circumstance" requiring a Board vote on a Regent's request, the Board delegated to Chairman Foster (not Chancellor McRaven) the authority to determine whether the information related to Hall's duties as a Regent and to provide it to him in unredacted form. There is no indication in the record that Hall ever availed himself of the second step of the Board-approved process.

Hall does not contend that McRaven failed to follow the process outlined in the Regents' Rules for responding to a request from an individual Regent for a significant amount of information. Hall does not contend that McRaven acted outside his authority by failing to implement the two-step process or refusing to discuss specific documents that had been redacted. While Hall attached a sample of 27 pages of redacted records for the trial court's benefit in the proceedings below, he does not challenge the redactions to those documents only, nor is there evidence in the record that he discussed those 27 pages with the Chairman of the Board, as provided in the second step of the Board-approved process.

17

Instead, Hall contends that, as a Regent, he is entitled to review the Kroll documents based on the Legislature's assignment to Regents "of both general governance responsibilities and the specific duty to set admissions standards consistent with UT's role and mission," unless providing the requested information to him would violate another law. Accordingly, Hall contends, McRaven did not have legal authority to "withhold from a [R]egent information directly relevant to the duties that Texas law requires the [R]egent to perform." The central premise of Hall's argument is that he is entitled to see all personally identifiable student information in the Kroll file with no redactions because the information relates to the Board's duty to set appropriate admissions standards, and thus, he has a "legitimate educational interest" in the personal information entitling him to access under FERPA because he has a legitimate educational interest in the topic to which it relates. At heart, Hall challenges what he characterizes as McRaven's determination that FERPA and other privacy laws preclude Hall from reviewing the documents in unredacted form and McRaven's refusal to provide Hall with the unredacted Kroll documents. On the record before us, however, it is the ***Board***—not McRaven—who denied Hall access to the documents in unredacted form, having implicitly determined that Hall does not have a legitimate educational interest in the information and that it may be protected by other privacy laws.[5]

---

[5] Hall testified that a majority of the Board has never voted to let him see the Kroll documents without redaction of personally identifiable student information and that the Board instructed McRaven to provide the Kroll documents in redacted form:

> [Counsel] Q. All right. In passing on that motion at the July 8th meeting, the Board of Regents instructed the chancellor to provide you the Kroll documents redacted in accordance with the privacy law, correct?

18

Whether the Board's determination in this regard is correct is not before us, and we take no position on whether that decision would be reviewable by this Court. What is before us is the lawsuit against McRaven in his official capacity and the existence or lack of subject-matter jurisdiction. Consequently, what is specifically before us to decide is whether McRaven acted outside the scope of his legal authority.

Based on the record before us, the Board has determined that Hall may only review the Kroll documents with redactions to comply with FERPA and other privacy laws. To the extent McRaven can be said to have taken any action since the July vote, McRaven has not acted outside the scope of his legal authority by withholding the unredacted documents. McRaven is "[s]ubject to the power and authority of the board," and thus, he must comply with the Board's directives. Tex. Educ. Code § 65.16(c); *see also* Regents' Rules, Rule 20101: Chancellor, § 1 (Role). The process established by the Board allows Hall to review the redacted documents, and if Hall identifies specific redacted information and can articulate a specific need to see that information related to his official

| [Hall] | A. | Yes. |
|---|---|---|

. . . .

| [Counsel] | Q. | The amended Rule 10801 requires a majority vote to authorize documents demanded by a regent when the issue has been raised before the board; is that correct? |
|---|---|---|
| [Hall] | A. | Yes. |
| [Counsel] | Q. | A majority of the board has never voted to let you see the Kroll documents without redaction of personally identifiable student information protected by the privacy laws, correct? |
| [Hall] | A. | Correct. |

19

duties, he can discuss that specific information and his need to see it with the Chairman and the Chancellor. The Board then delegates to its Chairman—not Chancellor McRaven—in consultation with the Vice Chairmen and General Counsel to the Board, the authority to determine whether a specific need for information is related to Hall's official duties. Hall has not established that McRaven acted outside of his granted authority under the Regents' Rules to respond to a Regent's request by withholding the unredacted documents, and therefore acted ultra vires, because it was the Board, through its majority vote, who ultimately refused to allow Hall full access to the Kroll file without redaction. *See Houston Belt*, 487 S.W.3d at 164 (sovereign immunity extends to those governmental officers who act within their granted discretion).

**Ministerial duty**

Hall also asserts that McRaven's duty to provide a Regent with requested information is nondiscretionary and thus ministerial. However, as discussed above, the Regents' Rules provide otherwise. *See* Regents' Rules, Rule 10801: Policy on Transparency, Accountability, & Access to Information, § 5.4 (Requests by Members of the Bd. of Regents & Chancellor), at 5.4.5 (requiring majority vote of Board to approve significant information requests of concern to Chancellor or Chairman). Hall argues that (1) McRaven must provide Hall with information he requests in his capacity as Regent unless Hall's review of that information is prohibited by law; (2) the Regents' statutory governance duties, including the duty to set admission standards, mean that Hall's review of the Kroll file would not violate privacy law; and (3) therefore, McRaven has a ministerial duty to provide Hall the Kroll file in its entirety in its unredacted form.

20

Ministerial acts are those for which "'the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.'" *Emmett*, 459 S.W.3d at 587 (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)). Hall argues that McRaven failed to perform the ministerial act of providing him with the requested information, because in Hall's view, either McRaven had no discretion to determine that FERPA or other privacy laws prohibit Hall's review of the information or McRaven misinterpreted FERPA and other privacy laws, which he has no discretion to do, by determining that FERPA and other privacy laws prohibit Hall's review of the information. However, as we have explained, the Board made the determination that Hall did not demonstrate the legitimate educational interest required under FERPA to allow him to see the entirety of the Kroll file and that the documents should be redacted to comply with FERPA and other privacy laws for Hall's review. Having been provided with a directive from the Board after following the process set forth in the Regents' Rules for responding to a Regent's request for information, in this particular situation McRaven only has authority to provide Hall with redacted information unless the Board, through its Chairman, determines otherwise.

Hall also contends that individual Regents have an absolute and inherent right under Texas law to determine which UT System records they review. Hall, however, like each of the other Regents, is subject to the Rules and Regulations promulgated by the Board, which have the same force as statutes. The Regents' Rules provide a procedure by which the Board as a whole may consider and either approve or disapprove by majority vote an individual Regent's request for a significant volume of information, a procedure that Hall acknowledges was validly enacted.

21

Regents' Rules, Rule 10801: Policy on Transparency, Accountability, & Access to Information, § 5.4 (Requests by Members of the Bd. of Regents & Chancellor), at 5.4.5. Hall has not challenged the Board's authority to disapprove his request—instead, he argues that "McRaven violated his duty as a university employee to provide relevant information when officially requested by a member of the governing board." In this case, however, it was the Board majority that determined what type of access Hall should have to the Kroll documents.

On this record, the trial court did not have subject-matter jurisdiction under the ultra vires exception to sovereign immunity, and we overrule Hall's first issue. Because we hold that the trial court lacked subject-matter jurisdiction for this reason, we need not reach Hall's issues related to mootness and standing. *See* Tex. R. App. P. 47.1.

## CONCLUSION

Having determined that Hall's suit against McRaven is barred by sovereign immunity, we affirm the trial court's order granting McRaven's plea to the jurisdiction.

_____

Cindy Olson Bourland, Justice

Before Chief Justice Rose, Justices Pemberton and Bourland

Affirmed

Filed: September 16, 2016

22